## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

SHARI ANN WIGINTON,

     Plaintiff,

v.                                  Case No. 3:20-cv-5387-LC/MJF

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Shari Ann Wiginton initiated this action under 42 U.S.C. § 405(g) to obtain review of a final adverse decision of the Commissioner of the Social Security Administration. Plaintiff timely pursued and exhausted her administrative remedies. The Commissioner applied the proper standards, and his findings of fact and determinations are supported by substantial evidence. The undersigned, therefore, respectfully recommends that the decision of the Commissioner be affirmed.[1]

---

[1] The District Court referred this case to the undersigned pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 71.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.

# I. PROCEDURAL HISTORY

On July 14, 2017, Plaintiff protectively filed an application for a period of disability and disability insurance benefits alleging disability beginning July 14, 2017. (Tr. 91-92, 191-92).[2] The Social Security Administration denied her claim initially and upon reconsideration. (Tr. 78-122). On May 20, 2019, Plaintiff—represented by counsel—appeared and testified at a video hearing before an administrative law judge ("ALJ"). On June 27, 2019, the ALJ issued a written decision in which he found that Plaintiff was not disabled. (Tr. 23-34). On February 14, 2020, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

# II. FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following findings relevant to the issues raised in this appeal:

(1) Plaintiff met the insured status requirements of the Act through December 31, 2022;

---

[2] All references to "Tr." refer to the transcript of the Social Security Administration record filed on November 3, 2020. The page numbers cited herein are those found on the bottom right-hand corner of each page of the transcript rather than the page numbers which were assigned by the court's electronic docketing system.

(2) Plaintiff was engaged in substantial gainful activity from July 14, 2017, through December 15, 2017. There was, however, a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity, and the ALJ limited his analysis only to that period;

(3) Plaintiff had the following severe impairments: lumbar facet arthritis, scoliosis, lumbago, sacroiliac disorder, status post right sacroiliac joint fusion, and arthralgia;

(4) Plaintiff did not have an impairment or combination of impairments that met or medically-equaled the severity of one of the listed impairments;

(5) Plaintiff had the Residual Functional Capacity ("RFC") to perform light work with the following limitations:

(a) she can occasionally climb, kneel, crouch, and crawl;

(b) she can frequently stoop and bend in order to sit;

(c) she can occasionally bend from a sitting position;

(d) she must avoid concentrated exposure to extreme cold, vibration, and hazards such as unprotected heights and dangerous machinery;

(6) Plaintiff was capable of performing past relevant work as an office manager and paralegal; and

(7) Plaintiff was not under a disability from July 14, 2017, through the date of the ALJ's decision. (Tr. 28-34).

### III. STANDARD

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The Commissioner's decision will not be disturbed if the decision is supported by substantial evidence *and* the Commissioner applied proper legal standards. 42 U.S.C. § 405(g); *Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). The threshold for the evidentiary sufficiency in Social Security cases is not high. *Biestek v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is "more than a mere scintilla." *Id.* It is not a preponderance, and it requires only "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant could not perform his previous work and could not, "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g),[3] the Commissioner analyzes a disability claim in five steps:

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments or combination of impairments that meet or equal those listed in 20 C.F.R. Part 404?

4.    Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent other work?

---

[3] In general, the legal standards applied are the same regardless of whether a plaintiff seeks DIB or Supplemental Security Income ("SSI"), but separate, parallel statutes and regulations exist for DIB and SSI claims. *See* 20 C.F.R. §§ 404, 416. Therefore, citations of statutes or regulations found in quoted court decisions in this report and recommendation should be considered to refer to the appropriate parallel provision.

A plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512; *see Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278 (11th Cir. 2020) ("A claimant bears the burden at the first four steps."). If the plaintiff establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the plaintiff's impairments, the claimant can perform. *Goode*, 966 F.3d at 1278; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the plaintiff then must prove that he cannot perform the work suggested by the Commissioner. *Goode*, 966 F.3d at 1279; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  PLAINTIFF'S MEDICAL HISTORY

### A.  <u>Relevant Medical History</u>

On November 3, 2017, February 6 and July 25, 2018, and January 22, 2019, Plaintiff reported to her primary care physician, Dr. David Zielinski, M.D., for treatment of her physical impairments. During his examinations, Dr. Zielinski completed a review of systems and noted that Plaintiff's mood was "normal." (Tr. 370, 373, 548).

On April 19, 2018, Plaintiff attended a consultative examination with Dr. John Blaze, Ph.D. (Tr. 402-405). Plaintiff reported that she suffered panic attacks, avoidance personality, depression, and anxiety. (Tr. 402). Plaintiff informed Dr.

Blaze that she experienced extreme anxiety in unfamiliar locations and when she is around a lot of people. She also described situations in which she avoids social interactions and places with large amounts of people and that she does not attend social gatherings regularly. (Tr. 402-03). Plaintiff indicated that she had experienced abuse and trauma more than six months prior to the evaluation. This had resulted in hyperarousal, intrusive thoughts of the incidents, avoidance behavior, and re-experiencing symptoms in the form of extreme nightmares. Dr. Blaze diagnosed Plaintiff with a panic disorder, agoraphobia, post-traumatic stress disorder ("PTSD"), and major depressive disorder, recurrent and moderate. (Tr. 405).

Dr. Blaze's evaluation notes indicate that Plaintiff demonstrated adequate attention and concentration throughout the evaluation. Plaintiff was able to answer questions without distraction and was able to complete tasks of alphabetic and numeric reiteration without errors. Plaintiff's immediate, recent, and remote memory appeared to be adequate. (Tr. 404). She was able to recall 3 of 3 words immediately after presentation, 2 of 3 words presented after a short delay, and she was able to recall specific details regarding past autobiographical events. (Tr. 404). Dr. Blaze also noted that Plaintiff "displayed adequate social skills." (Tr. 404). During her evaluation, she displayed a positive attitude and her cooperation and effort during the evaluation were adequate. (Tr. 402). Additionally, her judgment "related to self-care and social problem-solving appeared to be adequate as evidenced by an

understanding of personal safety, solution-focused ideas, and social interactions." (Tr. 404).

Dr. Blaze concluded that Plaintiff's "mental health symptoms based on report and clinical observations appear to be severely impacting activities of daily living, vocational performance, and interpersonal interactions." (TR. 405).

Starting in April 2018, Plaintiff presented to Bridgeway Center Inc. for medication management and for individual therapy. On April 25, 2018, Mamie Quenga conducted a mental status evaluation of Plaintiff. (Tr. 411-15). Plaintiff reported that she had a lifelong struggle with PTSD, anxiety, depression, and panic disorder. She stated that her depression began to increase when she was fired from her job. (Tr. 411). Since being fired, Plaintiff suffered insomnia, panic attacks, and nightmares. She took Xanax to go back to sleep. She reported that she was afraid to get out of bed in the morning. (Tr. 411). Although Plaintiff's mood was assessed as depressed, Quenga indicated that Plaintiff's behavior and attitude during the evaluation were cooperative. Plaintiff reported that she had suicidal thoughts two or three days before the evaluation, but that she did not want to act on them. (Tr. 413). Quenga noted that Plaintiff was often distracted, and Plaintiff explained that she could not concentrate and that her memory was not well because of her age. (Tr. 413-14). Quenga diagnosed Plaintiff with PTSD and major depressive disorder, severe. (Tr. 414).

On May 3, 2018, Plaintiff returned to Bridgeway Center for medication management with ARNP Erin Siatkowski. (Tr. 421). Plaintiff reported that her current level of depression was 7 or 8 on a scale of 1 to 10. She told Siatkowski that she had panic attacks where she feels very anxious, but she did not know how often the panic attacks occurred nor could she identify any triggers. She indicated that previously seeing her father would elicit a panic attack. Although she had chronic passive suicidal ideations since childhood, she denied having a plan or intent to act on the ideations. Siatkowski noted that Plaintiff's mood was depressed and anxious; however, Plaintiff was alert and cooperative during the examination. (Tr. 419). Her speech was normal. Additionally, Plaintiff did not report having difficulty concentrating. Siatkowski described Plaintiff's attention, concentration, and memory as "adequate." (Tr. 418, 420). Siatkowski diagnosed Plaintiff with PTSD, generalized anxiety disorder, bipolar disorder, and panic disorder. She also prescribed Latuda in addition to Plaintiff's treatment regimen of Xanax and Zoloft. (Tr. 420).

On May 31, 2018, Plaintiff began individual therapy with Kelli Harrell, a licensed mental health counselor. (Tr. 432). Plaintiff arrived on time for the appointment. Plaintiff reported having difficulty getting out of bed and having passive suicidal thoughts. She also shared that a current stressor in her life was socializing with friends.  (Tr. 432). Her mood was euthymic. (Tr. 432).

Also on May 31, 2018, Plaintiff was seen by Siatkowski for medication management. Plaintiff brought disability paperwork from her attorney with her, but Siatkowski advised Plaintiff that she would need to be seen at least six months before Siatkowski could complete the form. Plaintiff indicated that her mood had lifted some, but she still felt depressed. (Tr. 428). She indicated that she had passive suicidal thoughts from time to time, but she denied ever making a plan or having the intent to kill herself. Plaintiff was agreeable to an increased dose of Latuda to treat her depression. Siatkowski observed that Plaintiff's mood was sad but that her memory, attention, and concentration were intact. (Tr. 429).

On June 14, 2018, Plaintiff returned to Harrell for mental health therapy. Harrell described Plaintiff's mood as depressed, and Plaintiff reported feeling disappointed that her friend had canceled plans with her. (Tr. 427).

On June 28, 2018, Siatkowski again evaluated Plaintiff. Plaintiff indicated that she lived with a roommate, she had been sleeping excessively, and her energy was low. She stated that Latuda lifted her mood slightly, but she still felt very depressed. She described her concentration as poor. Upon examination, however, Plaintiff's memory, attention, and concentration were intact. (Tr. 423-24). Plaintiff's mood was depressed, but she denied suicidal ideations and self-injurious thoughts and behaviors. Siatkowski prescribed Wellbutrin.

Progress notes from Plaintiff's therapy session on July 13, 2018 indicate that Plaintiff arrived on time for her scheduled appointment. Plaintiff felt more confident and hopeful for the future. (Tr. 422). She had spent time with a friend and had set up her office. (*Id.*). Her mood was euthymic.

On July 17, 2018, Plaintiff returned to Bridgeway Center for individual therapy. Plaintiff reported being more social. Specifically, she was talking and spending more time with friends. Her mood was euthymic, and her affect was congruent. (Tr. 492). On August 10, 2018, Plaintiff presented for individual therapy with Kelli Harrell. Plaintiff was taking care of her roommate. She discussed difficulty with sleep and nightmares. Plaintiff's mood was emotional, but she did not report suicidal ideations.

Also on August 10, 2018, Plaintiff returned for medication management and reported that she was feeling better. She indicated that the addition of Wellbutrin gave her some relief. (Tr. 568). Plaintiff reported that she was taking her medication as instructed. Although she appeared depressed, her memory, attention, and concentration were intact. (Tr. 569). Her speech was within normal limits, and she was oriented to person, place, and time. Her thought form was logical and linear, and she denied suicidal ideations and self-injurious thoughts. (Tr. 569).

On September 11, 2018, Plaintiff presented for medication management. She indicated that her mood had been depressed and she had frequent nightmares which

would cause her to wake suddenly. (Tr. 563). She was agreeable to a trial of Prazosin. (Tr. 564). Her mood was depressed, her thought processes, however, were within normal limits. Plaintiff's memory, concentration, and attention were intact. (Tr. 564). ). Her speech was within normal limits and she was oriented to person, place, and time. Her thought form was logical and linear, and she denied suicidal ideations and self-injurious thoughts. (Tr. 564).

On October 20, 2018, Plaintiff went to the Fort Walton Beach Medical Center Emergency Department. Plaintiff indicated that she was having difficulty coping. Ten days prior, she saw her partner of fifty years commit suicide. (Tr. 516). Plaintiff had "called someone" who instructed Plaintiff to go to the emergency department. Plaintiff reported having a close relationship with her sister and daughter. She was depressed and tearful, but she denied having thoughts of harming or killing herself. Plaintiff appeared confused and her judgment and insight were abnormal. (Tr. 518). Medical personnel offered Plaintiff voluntary psychiatric help, but Plaintiff declined and stated that she would follow up with Bridgeway.

On November 13, 2018, Plaintiff returned for medication management at Bridgeway Center, Inc. She brought with her paperwork for disability benefits. Plaintiff reported that she lived with a roommate. She also stated that she had been depressed and anxious since her previous roommate's suicide. She had some difficulty falling asleep at night, but she felt that Prazosin had helped with her

nightmares. She agreed to an increased dosage of Prazosin to address her nightmares and PTSD. She indicated that she adhered to the medication regimen as prescribed. Plaintiff was alert and cooperative. (Tr. 559). Siatkowski noted that Plaintiff's mood was depressed. Plaintiff's memory, attention, and concentration were intact. (Tr. 559). Her speech was within normal limits, and she was oriented to person, place, and time. Her thought form was logical and linear, and she denied suicidal ideations and self-injurious thoughts.

On February 21, 2019, Plaintiff left her individual therapy treatment voluntarily before completing treatment. (Tr. 552). Plaintiff testified that she stopped going to therapy because "it just wasn't doing me any good." (Tr. 66). Additionally, on February 21, 2019, Plaintiff returned for medication management. (Tr. 553). She was alert and cooperative. (Tr. 554). Plaintiff stated that she lived with a roommate and was doing "so-so." (Tr. 553). Although she continued to have nightmares and feel depressed, she did not want to increase the dosage of Prazosin, Zoloft, or Latuda. (Tr. 553). She also wanted to stop taking Wellbutrin because she suspected that it was contributing to her elevated blood pressure, and she did not like taking several medications. (Tr. 553). As with her previous examinations, Plaintiff's mood was depressed. Plaintiff's memory, attention, and concentration were intact. (Tr. 554). Her speech was within normal limits, and she was oriented to person, place, and

time. Her thought form was logical and linear, and she denied suicidal ideations and self-injurious thoughts.

Siatkowski also provided a medical opinion. She opined that Plaintiff was seriously limited in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances. She also indicated that Plaintiff would be unable to meet competitive standards with respect to: (1) completing a normal workday and workweek without interruptions from psychologically-based symptoms; (2) performing at a consistent pace without an unreasonable number and length of rest periods; and (3) dealing with normal work stress.

Siatkowski further concluded that Plaintiff had a limited but satisfactory ability to (1) remember work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) maintain attention for two-hour segments; (4) work in proximity with or coordination with others without being unduly distracted; (5) make simple work-related decisions; (6) ask simple questions and request assistance; (7) accept instructions and respond appropriately to criticism; (8) respond appropriately to changes in a routine work setting; (9) interact with the public; and (10) use public transportation. (Tr. 541). Siatkowski found that Plaintiff would miss four or more days of work per month and that she would be off task 20 percent of the workday. Siatkowski indicated that Plaintiff was incapable of even low stress work. (Tr. 542).

**B.**    **Relevant Hearing Testimony**

At the hearing, Plaintiff stated that she could not go back to her previous job because her concentration was "off" and she was easily distracted. (Tr. 59-60). Plaintiff testified, however, that she was capable of socializing with friends and that she generally got along with others. (Tr. 66, 237-38). Plaintiff reported that she was able to drive, shop for groceries, and attend medical appointments. (Tr. 66, 234-37). She indicated when she was having a bad day "mentally," she spent ten to twelve hours per day in bed. (Tr. 63).

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE five hypothetical questions. First, the ALJ asked the VE whether a person similar to Plaintiff, who could meet medium exertional work, with occasional climbing and balancing and occasional pushing and pulling with the lower extremities such as foot pedals, could perform Plaintiff's past work. (Tr. 67). The VE indicated that such a person could perform Plaintiff's past work and other jobs in the national economy. (Tr. 67-68).

Second, the ALJ asked the VE to consider the same hypothetical with additional limitations insofar as the person would be limited to doing simple work and no fast-paced work, such as any production work. The VE testified that this hypothetical person could not perform Plaintiff's previous work; however, they would be able to perform other jobs in the national economy. (Tr. 68-69).

The ALJ's third hypothetical asked the VE to consider whether Plaintiff's past relevant work could be performed by a hypothetical person who was limited to light work, but who: (1) could occasionally climb, kneel, crouch, and crawl; (2) could frequently stoop and bend in order to sit; (3) could occasionally bend from a standing position; and (4) must avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 69). The VE testified that "with no other limitations her past work as described in the DOT would comply, but not as performed." (Tr. 70). The VE provided additional examples of jobs that existed in the national economy that this hypothetical person could perform. (*Id.*).

In the fourth hypothetical, the ALJ added the following limitations to hypothetical number three: the person would be limited to doing simple work and no fast-paced work or any production work. The VE testified that this hypothetical person could not perform Plaintiff's past work because her past work was "all skilled." (Tr. 70). There were, however, other jobs that this hypothetical person could perform. (Tr. 71).

The final hypothetical asked the VE to assume the hypothetical person would have the limitations identified by ARNP Siatkowski in her medical opinion. The VE testified that the hypothetical person would not be able to perform past work. The VE testified that these limitations would preclude work at any level on a competitive basis. (Tr. 75).

## V. DISCUSSION

## A.    **The ALJ Gave Proper Weight to the Medical Opinions**

Plaintiff argues that the ALJ erred in evaluating the opinions of the psychologist Dr. John Blaze and APRN Erin Siatkowski. In addressing these opinions the ALJ stated:

> The undersigned is not persuaded by the medical source from Dr. Blaze and Nurse Siatkowski. Both examinations were internally inconsistent with their own exam and/or treatment notes. Further, the record demonstrated that in only 10 months, the claimant's mental impairments were generally controlled by medication as most of the objective mental status examinations were well within normal limits. Further, by her own words, [Plaintiff] was able to perform her activities of daily living without assistance.

(Tr. 30).

Prior to March 27, 2017, an ALJ was required to assign greater weight to the opinions of treating physicians. *See* 20 C.F.R. § 416.927(c)(2); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). This rule, referred to as the "treating-physician rule" required ALJs to assign controlling weight to the opinion of a treating physician if the opinion was well supported and not inconsistent with other evidence in the record. *See* 20 C.F.R. § 416.927(c)(2); *Lewis*, 125 F.3d at 1440. If an ALJ assigned less than controlling weight to a treating physician, the ALJ had to

provide good cause for doing so. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011); *Lewis*, 125 F.3d at 1440.[4]

Revised Social Security regulations—published on January 18, 2017 and which became effective on March 27, 2017—eliminated the treating physician rule. *See* 20 C.F.R. §§ 404.1520c, 416.920c (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."); *Planas v. Comm'r of Soc. Sec.*, 842 F. App'x 495, 497 n.1 (11th Cir. 2021) ("For claims filed on or after March 27, 2017, . . . no significant weight is given to statements made by treating physicians as opposed to non-treating medical sources."); *Pemberton v. Saul*, 953 F.3d 514, 517 n.2 (8th Cir. 2020) (The SSA "has adopted new regulations about the weight afforded to treating physicians' opinions," these new "regulations only apply to claims filed after March 27, 2017."); *Olivas v. Saul*, 799 F. App'x 389, 391 n.1 (7th Cir. 2019) ("The treating physician rule applies only to claims like [the Plaintiff's] that were filed before March 27, 2017, when the regulations changed prospectively."); Revisions to Rules Regarding

---

[4] "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Winschel*, 631 F.3d at 1178-79 (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004)).

the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017) ("[W]e are not retaining the treating source rule in final 404.1520c and 416.920c for claims filed on or after March 27, 2017).

In revising the regulations to remove the treating-source rule, the SSA explained that "Courts reviewing claims under the [old] rules have focused more on whether we sufficiently articulate the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decisions." Furthermore "these courts, in reviewing final agency decisions, are reweighing evidence instead of apply the substantial evidence standard of review, which is intended to be highly deferential standard to us." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017).

Under the new regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c, 416.920c(a). Instead, "when a medical source provides one or more medical opinions or prior administrative medical findings" the SSA "will consider those medical opinions or prior administrative medical findings from that medical source together with" the following factors as appropriate: (1) supportability, consistency, relationship with the claimant, specialization, and other facts. 20 C.F.R. §§ 404.1520c, 416.920c(a).

Now, the "most important factors" the SSA considers when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.*; *Mackey v. Saul*, 2020 WL 376995, at \*4 n.3 (D.S.C. Jan. 6, 2020) (citing 20 C.F.R. § 404.1520c(a),(c)(1)-(2)); *Tucker v. Saul*, 2020 WL 3489427, at \*6 (N.D. Ala. June 26, 2020). Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1)-(2); 416.920c(c)(1)-(2). Although the ALJ must explain how she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in the ALJ's decisions, the ALJ is "not required to explain" how she considered any other factors. 20 C.F.R. § 416.920c(b)(2).

### 1. *The ALJ's Assessment of Dr. Blaze's Opinion*

Dr. Blaze opined that Plaintiff's "mental health symptoms based on report and clinical observations appear to be severely impacting activities of daily living, vocational performance, and interpersonal interactions." (Tr. 405).

There is substantial evidence to support the ALJ's determination that Dr. Blaze's opinion was internally inconsistent. For example, Plaintiff reported the following to Dr. Blaze:

> her daily routine consists of waking at 10:30 am and retiring for bed at 10:30 pm. She spends her day watching TV, chatting with friends, and housework. She responded that she was able to bathe, dress, and toilet independently. She is able to drive a vehicle and go to the grocery store independently. She is able to prepare food without assistance and is able to complete basic household chores without assistance, pay bills and manage her money effectively.

(Tr. 403). In other words, Plaintiff reported that she was able to perform her activities of daily living without assistance. Plaintiff also testified to the ALJ that she was able to perform her activities of daily living without assistance. (Tr. 62-63, 67).[5] Thus, Plaintiff's own testimony was inconsistent with Dr. Blaze's report that Plaintiff's mental health symptoms were severely impacting her activities of daily living. *Evans v. Comm'r, Soc. Sec. Admin.*, 551 F. App'x 521, 524 (11th Cir. 2014) (noting that there was good cause to discount a physician's opinion when it was contradicted by the plaintiff's self-reported daily activities and was inconsistent with his own notes); *Good v. Astrue*, 240 F. App'x 399, 403 (11th Cir. 2007) (noting that the ALJ did not err in discounting a physician's opinion when it was not supported by his own notes

---

[5] In her testimony, Plaintiff stated that she had *physical limitations* which affected her daily living activities. Plaintiff, however, does not challenge the ALJ's finding as it relates to her *physical* impairments.

and was inconsistent with the plaintiff's own testimony); *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (holding that there was good cause to discount a physician's opinion when it was at odds with the prior observations and the plaintiff's admission concerning her activities).

Similarly, Dr. Blaze opined that Plaintiff's mental health symptoms severely impacted her vocational performance.[6] (Tr. 405). When Dr. Blaze examined Plaintiff, however, her immediate, recent, and remote memory were adequate. Specifically, Plaintiff "was able to recall 3 of 3 words immediately after presentation . . . and claimant was able to recall 2 of the 3 words presented after a short delay." (Tr. 403). Additionally, she "was able to recall specific details regarding past autobiographical events" and was able to answer all of Dr. Blaze's questions with specific information and dates without difficulty. (Tr. 402, 403). This observation is also supported by other evidence in the record indicating that Plaintiff's memory remained intact. (Tr. 420, 424, 429, 494-95, 564, 559, 569, 576, 589).

---

[6] Per the social security regulations, a "severe" impairment is one that "significantly limits a claimant's ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 404.1522; *Bridges v. Bowen*, 815 F.2d 622, 625 (11th Cir. 1987). Basic work activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. § 404.1522. Basic mental activities include "understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b).

Dr. Blaze also noted that Plaintiff's attention and concentration were adequate. (Tr. 403). Indeed, Dr. Blaze found that Plaintiff

> was able to attend to the evaluator's questions throughout the interview without distraction and was able to complete tasks of alphabetic and numeric reiteration without errors. [Plaintiff's] mental flexibility appeared to be adequate as she was able to spell the word "world" backward and complete simple tasks of serial calculations without errors, [Plaintiff] did not display any significant difficulties in processing speed. [Plaintiff's] receptive language appeared to be adequate as she was able to complete all verbal commands presented without errors and expressive language appeared to be adequate as she was able to complete all written tasks presented without error.

(Tr. 403). This observation also is consistent with other objective medical evidence. (Tr. 418, 420, 424, 429, 494-95, 564, 559, 569, 576, 581, 589). Thus, Dr. Blaze's examination report—and other medical evidence in the record—is inconsistent with Dr. Blaze's opinion that Plaintiff's mental health symptoms severely impaired her vocational performance. *Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 850 (11th Cir. 2006); *Eaton v. Colvin*, 180 F. Supp. 3d 1037, 1060 (S.D. Ala. 2016) (noting that there is good cause to discount a physician's opinion when there were no indications of deficits in the plaintiff's overall concertation or attention).

Finally, Plaintiff reported to Dr. Blaze that she experienced "extreme anxiety" when she is in unfamiliar locations or when she is around a lot of people. Plaintiff "described situations in which she avoids social interactions and places with large amounts of people, which has caused her problems in relations." (Tr. 403). She also stated that she felt tense "in these situations, [made] fists, and gritted teeth." (Tr.

403). However, Dr. Blaze noted that Plaintiff's social skills were "adequate" and that her "judgment related to self-care and social problem-solving appeared to be adequate as evidenced by an understanding of personal safety, solution-focused ideas, and social interactions." (Tr. 404). Additionally, Plaintiff displayed a positive attitude during the evaluation and she adequately cooperated with Dr. Blaze and put forth appropriate effort. The evidence also indicated that Plaintiff socialized with friends and family, lived with others, and generally was able to get along with others. (Tr. 30, 66, 236-37, 403, 412, 417, 418, 422, 423, 492, 574, 593). This evidence indicates that Plaintiff's mental health limitations—as they relate to social interactions—was not as great as Dr. Blaze opined.

As discussed above, the ALJ's rationale for discounting Dr. Blaze's opinion as "not persuasive" was supported by substantial evidence. Thus, the ALJ did not err in evaluating Dr. Blaze's opinion.

### 2.    *The ALJ's Assessment of ARNP Siatkowski's Opinion*

ARNP Siatkowski opined that Plaintiff was (1) seriously limited in her ability to maintain regular attendance and be punctual within customary, usually strict tolerances. She also indicated that Plaintiff would be unable to meet competitive standards in: (1) completing a normal workday and workweek without interruptions from psychologically based symptoms; (2) performing at a consistence pace without an unreasonable number and length of rest periods; and (3) dealing with normal work

stress. ARNP Siatkowski concluded that Plaintiff had a limited but satisfactory ability to (1) remember work-like procedures; (2) understand, remember, and carryout very short and simple instructions; (3) maintain attention for two-hour segments; (4) work in proximity with or coordination with other without being unduly distracted; (5) make simple work-related decisions; (6) ask simple questions and request assistance; (7) accept instructions and respond appropriately to criticism; (8) respond appropriately to changes in a routine work setting; (9) interact with the public; and (10) use public transportation. (Tr. 541). Siatkowski found that Plaintiff would miss four days or more per month and that she would be off task 20 percent of the workday. Siatkowski indicated that Plaintiff was incapable of even low-stress work. (Tr. 542).

As noted above, the ALJ gave three reasons for discounting Siatkowski's opinion: it was inconsistent with Siatkowski's own treatment notes; the record demonstrated that Plaintiff's impairments were generally controlled by medication; and Plaintiff stated that she was able to perform activities of daily living without assistance. (Tr. 31). There is substantial evidence to support the ALJ's opinion.

First, there are internal inconsistencies with ARNP Siatkowski's opinion and her medical records. For example, ARNP Siatkowski noted that Plaintiff would be

off-task 20% of a typical workday due to her symptoms.[7] In support of her position that the ALJ erred, Plaintiff cites one medical examination from April 25, 2018, in which Mamie Quenga noted that Plaintiff was "often distracted" and had difficulty concentrating. (Doc. 11 at 13 (citing Tr. 413-14)). Despite this single mental status examination which occurred at the beginning of Plaintiff's treatment, Siatkowski's objective examinations—which occurred on May 3, May 31, June 28, August 10, September 11, November 13, 2018, and February 21, 2019—consistently noted that Plaintiff's concentration and attention were normal and intact. (Tr. 420, 424, 429, 494-95, 564, 559, 569). This conclusion is supported by Dr. Blaze's objective evaluation report, as discussed above. (Tr. 403-05). Thus, Siatkowski's opinion that Plaintiff would be off-task 20% of the typical workday due to symptoms is not supported by her own medical records or the record as a whole.

Second, even though ARNP Siatkowski often described Plaintiff as depressed or sad, Plaintiff generally was on time for her appointments. Indeed, the record reflects that Plaintiff missed only one appointment during her ten-month course of treatment. (Tr. 403, 420, 424, 429, 494-95, 564, 568, 559, 569). Plaintiff consistently arrived on time for her appointments and her mental health evaluations were—with

---

[7] The questionnaire explained that "off task" meant how often the patient's symptoms likely would be severe enough to interfere with "***attention and concentration*** needed to perform even simple work tasks." (Tr. 542).

the exception of her depressed mood—consistently within normal limits. (Tr. 403, 420, 424, 429, 494-95, 564, 568, 559, 569). Furthermore, Siatkowski and Dr. Blaze described Plaintiff as being calm and cooperative during her evaluations. (Tr. 402, 413, 419). These facts undermine Siatkowski's opinion that Plaintiff would be unable to maintain even a low-stress job. (Tr. 542).

Third, although Siatkowski described Plaintiff's mood as being depressed or sad, and occasionally as anxious, her treatment notes and the therapy session notes indicate that medication improved Plaintiff's symptoms. For example:

- On May 31 and June 28, 2018, Plaintiff reported that her mood had lifted some with medication, but that she was still struggling with her depression. (Tr. 423, 428).

- During individual therapy, on May 31, 2018, Plaintiff's mood was euthymic.[8] (Tr. 432).

- On July 13, 2018, Plaintiff felt "more confident and hopeful for the future." She reported spending time with a friend, and her mood was described as euthymic. (Tr. 422).

---

[8] Euthymia is defined as "Joyfulness; mental peace and tranquility. Moderation of mood, not manic or depressed." Stedmans Medical Dictionary, available on Westlaw at STEDMANS 307600 (updated November 2014).

- On July 17, 2018, Plaintiff stated that she had become more sociable and was spending time with friends. Her mood was euthymic, and her affect was congruent. (Tr. 492).

- On August 10, 2018, Plaintiff reported that Wellbutrin improved her anxiety and depression. (Tr. 568).

- On November 13, 2018, Plaintiff indicated that Prazosin helped with her nightmares, although she was depressed and anxious because she had witnessed her roommate's suicide. (Tr. 558).

- On February 21, 2019, Plaintiff reported doing "so-so." Additionally, Plaintiff reported having nightmares and suffering from depression; however, she declined to increase her dosage of Prazosin, Zoloft, and Latuda. (Tr. 553).

Although Siatkowski consistently described Plaintiff's mood as depressed, Plaintiff reported some relief from her mental health-based symptoms because of medication and, ultimately, decided to not increase the dosage of some of her medications. This is an acceptable basis for the ALJ to discount the opinion of an advanced registered nurse practitioner. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (holding a court may discount a medical opinion when a plaintiff declines prescribed medication); *see Carter v. Colvin*, 569 F. App'x 687, 691 (11th Cir. 2014); *see McKern v. Comm'r*, No. 17-CV-944, 2019 WL 289881, at *3 (W.D.N.Y.

Jan. 23, 2019) (noting an ALJ can reject an opinion when the medical records show that the claimant improved with medication).

Furthermore, during each of these examinations, practitioners described Plaintiff's mental status generally as being within normal limits insofar as Plaintiff consistently was oriented to person, time, and place; her thoughts were logical and linear; her memory was intact; her concentration and attention were intact; and her speech was within normal limits. (Tr. 419-21, 424, 427-29, 432, 492). Even if Plaintiff's mood was depressed, there is no evidence in the objective notes that this impacted her mental status or caused an impairment. *Kirkirt v. Astrue*, No. 5:08-CV-501-OC-GRJ, 2010 WL 996519, at *9 (M.D. Fla. Mar. 17, 2010) (noting that "although the treatment note acknowledged Plaintiff's depressed mood and affect and noted Plaintiff's limited eye contact during the examination, the examiner also observed that Plaintiff's speech was normal, his thought processes were intact, and there were no deficits in concentration and/or his memory. Such findings are consistent with the ALJ's determination that Plaintiff's mental impairments did not significantly limit his ability to perform basic work activities.").

Accordingly, because there is substantial evidence supporting his finding, the ALJ did not err in discounting Siatkowski's opinion.

**B.**    **Substantial Evidence Supports the ALJ's RFC Assessment**

Plaintiff also argues that the ALJ erred in failing to include any social limitations in the RFC assessment. (Doc. 11 at 12). But there is substantial evidence to support the ALJ's determination that Plaintiff had only mild limitations in social interaction and that her RFC did not need to include any limitations on social interaction.

First, Dr. Blaze noted that Plaintiff had "adequate social skills." (Tr. 404). Second, ARNP Siatkowski noted that Plaintiff had "limited but satisfactory" ability to interact appropriately with the general public and "unlimited or very good" ability to "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." (Tr. 541). Third, Plaintiff reported living with roommates, having close relationships with her sister and daughter, socializing with friends, and shopping. (Tr. 30, 66, 236-37, 403, 412, 417, 418, 422, 423, 492, 574, 593). Fourth, Siatkowski, Dr. Blaze, and Quenga described Plaintiff as "cooperative" during her therapy, medication-managements sessions, and evaluations. (Tr. 402, 412, 419).[9]

---

[9] True, Plaintiff reported that she sometimes had problems getting along with "some family members," but that is not uncommon among families, and even Plaintiff conceded that this had "nothing to do with [her] disability." (Tr. 238). She did not indicate that she had difficulty interacting with anyone other than "some family members."

This evidence, in addition to Plaintiff's own testimony, provides substantial evidence to support the ALJ's determination that Plaintiff had mild limitations in interacting with others and did not need specific mental limitations in her RFC.

## VI. CONCLUSION

The Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g). Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, substantially erred in making his findings, or that any other ground for reversal exists. Accordingly, the undersigned respectfully **RECOMMENDS** that:

1.    The decision of the Commissioner be **AFFIRMED**, and this action be **DISMISSED**.

2.    **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.    The clerk of the court be directed to close the case file.

At Pensacola, Florida, this <u>3rd</u> day of August, 2021.

/s/ *Michael J. Frank*
_____
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not</u>**

**<u>control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**